[S.F. No. 24693. May 23, 1985.]

BRUCE THOMSON et al., Plaintiffs and Appellants, v.
HUBERT CALL et al., Defendants and Appellants;
CITY OF ALBANY et al., Defendants and Respondents.

634

## COUNSEL

Cooper, White & Cooper, Neil L. Shapiro and E. Garth Black for Plaintiffs and Appellants.

Jerome Berg for Defendants and Appellants.

Robert Zwebeb, City Attorney, Robert T. Anderson, Den-Dulk, Douglass & Anderson, Richard M. Heimann, Tonsing & Heimann and Edward R. Fitzsimmons for Defendants and Respondents.

Faber Johnston, City Attorney (Saratoga), as Amicus Curiae on behalf of Defendants and Respondents.

## OPINION

**KAUS, J.**—The truism that a person cannot serve two masters simultaneously finds expression in California's statutory doctrine that no public official shall be financially interested in any contract made by that person or by any body or board of which he or she is a member.[1] Plaintiffs in this taxpayers' suit challenge the validity of a transaction in which defendant Cebert Properties, Inc., purchased a parcel of land from defendants Hubert F. Call (Call) and Ruth L. Call, his wife, for $258,000 and then conveyed the parcel to the City of Albany (city)—while Call was a member of the Albany City Council.

The defendants named in the complaint included the city, the Calls, various council members who served with Call, Cebert Properties, Inc., and

---

[1]Of greatest statewide application are Government Code sections 1090, 1091, 1092, 1097, and 87100, and Education Code sections 35233, 35240, and 72539. Other provisions designed to meet particular conflict-of-interest problems are scattered throughout the other codes. (See, e.g., Health & Saf. Code, §§ 50904, 50905; Pen. Code, §§ 99, 100; Pub. Util. Code, §§ 12722, 12392; Bus. & Prof. Code, § 19423.)

three other corporations. After a nonjury trial, the court found (1) Call's financial interest in the transaction violated Government Code section 1090;[2] (2) the Calls were liable to the city for the $258,000 they received from the sale, plus interest; (3) the city was nevertheless to retain title to the land; and (4) relief was to be denied as to the other defendants. Judgment was entered accordingly.

The Calls appeal from the judgment insofar as it holds them liable to the city for the $258,000 plus interest. Plaintiffs appeal from it insofar as it denies relief as to the corporate defendants.[3] These appeals present the question of what remedies are available once a section 1090 violation is found and the fully performed underlying contract is adjudged void.

FACTS

The summit of Albany Hill commands a panoramic view of Albany and San Francisco Bay. In and before 1972, IGC owned 36 acres of land at the westerly base and on the adjacent slope of the hill. That slope and the summit were undeveloped in 1972. The land at the summit consisted of four contiguous parcels: a 1.1-acre parcel owned by the Calls; a 2-acre parcel which was the uppermost part of the 36 acres owned by IGC; a 2.2-acre parcel owned by a partnership (Albany Hill Associates); and a 2-acre parcel owned by Golden Gate Hill Development Co.

In 1972, all of these lands were within a hill control (HC) district established by the city's zoning ordinance. IGC's 36 acres were zoned R1HC (for single family dwellings) and the Calls' parcel was zoned R3HC (for high-rise, high-density residential units). Under a city ordinance, no building permit for the erection of any structure on HC district land could be issued unless a use permit had first been obtained from the city council.

Planning to construct a 2,500-unit high-rise residential complex on its 36-acre parcel, IGC applied to the city council for a use permit in July 1972. This application included a request that the parcel be rezoned from R1HC to R3HC. IGC's project proposal met with general approval at subsequent

---

[2]In pertinent part, section 1090 states that "[C]ity officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members." Unless otherwise noted, all section references are to the Government Code.

[3]The named defendants were Interstate General Corporation (IGC); Interstate General Development, Inc. (IGD); Interstate Albany Corp. (IAC); and Cebert Properties, Inc. (Cebert). At all times relevant to the challenged transaction, IAC was a subsidiary of IGD, IGD was a subsidiary of IGC, the stock of Cebert was owned by James J. Wilson, and James J. Wilson was both the president of IGC, IGD, and IAC and a director of all four corporations. For purposes of this litigation, the four corporations are essentially interchangeable.

public meetings. Members of the council repeatedly stated that any pending use permit should be subject to a condition requiring IGC to dedicate land on Albany Hill for use as parks and permanent open space.

In August 1972, the city council considered a parks and recreation commission proposal that a site for a municipal park be acquired at the summit of Albany Hill.[4] The council voted to "go on record as generally concurring" with the park proposal. Councilman Call, though present at the meeting, did not participate in the discussion of the proposal and he abstained from the vote.

A series of offers, counteroffers, and negotiations between IGC and the city began in October 1972, when the city attorney and the city's administrative officer proposed certain conditions to be included in the use permit. These included a requirement that IGC dedicate its two-acre summit parcel and a creekside parcel at the base of the hill to the city.

IGC rejected this condition on November 3, 1972, and proposed its so-called "$600,000 plan." This plan required IGC to "allocate" $600,000 of its own money for the acquisition of land for Overlook Park; to spend that sum, or less, for the acquisition of such land by IGC through "private negotiation"; to convey any land so acquired to the city, for use as part of the park; and to pay to the city any unexpended balance of the $600,000 for use in "condemning by eminent domain" any land required for the park but not acquired from IGC pursuant to the $600,000 plan.[5]

On November 10, 1972, the city offered an alternative proposal, at the same time asking IGC to "reiterate" the $600,000 plan outlined in its letter

---

[4] This site later became known as Overlook Park.

[5] Referring to "our application to develop our property in Albany," IGC's letter of November 3 continued: "Should our application be granted, we agree to allocate $600,000 to acquire such of the real property as may be available, first by private negotiation at what we, in our judgment, regard to be reasonable prices, at the hilltop area of Albany Hill, within the boundary line designated by the City . . . [as] . . . Overlook Park. [¶] While this property is not subject to any public use by the City and has not been heretofore the subject of any litigation in eminent domain for acquisition by the City, the developer is agreeable to providing the City, not as a consideration or a condition of the zoning application, but in the general overall public interest, with no countervailing advantage to the developer, concurrent with the issuance of the first construction permit, by deed to the City, as a gift, such of the real property as it has been able to acquire for the $600,000 that the City is agreeable to using as a gift for the sole purpose of being a permanent park and open space for the City . . . . [¶] The land, together with the acreage that we will be dedicating . . . will provide the City . . . with a unique, superb and useful view park for the public enjoyment and open space. If, in our negotiations, we are unsuccessful in concluding purchase arrangements with the private landowners who own real property within the area of the proposed park, we reserve the right to pay over to the City . . . all unexpended funds, as a gift and not as a consideration of any zoning application, from the $600,000 so that the City may use these funds solely for condemning by eminent domain all of the lands that the City requires [for Overlook Park]."

of November 3. In a letter dated November 12, 1972, IGC reiterated the $600,000 plan, offering to expend the $600,000 in acquiring additional property for the proposed Overlook Park, all at or above the 200-foot contour of the hill, and to donate its own 2-acre parcel at the summit. The only land at or above the 200-foot contour not already owned by IGC consisted of the contiguous parcels owned by the Calls, Albany Hill Associates, and Golden Gate Hill Development Co.

The city council acted on IGC's application at a meeting on November 13, 1972. In the first of three successive votes, the council amended Albany's zoning ordinance to rezone IGC's thirty-six acres from R1HC to R3HC. Next, it voted to grant the use permit to IGC on specified conditions which included conveyance of IGC's two-acre parcel to the city "for the sole purpose of being a permanent park and open space for the City."[6] The $600,000 plan—not listed as a condition of the use permit—was reached in the council's third action, when a majority voted to accept IGC's "offer" to allocate $600,000 "for the purpose of purchase of additional private property to encompass the proposed Overlook Park . . . ." Call was present at this meeting. He voted to rezone IGC's property and to grant the use permit. He abstained from the vote that the city "accept the offer" of IGC relative to the $600,000 plan.

It should be noted that on several occasions Call asked the city attorney whether or not he could speak on certain issues or vote on certain issues pending before the council, and on such occasions he was advised not to speak or vote if real property in which he had a financial interest was involved in the pending issues. Call generally followed such advice when it was sought and given. In this instance, he was told by the city attorney that he could discuss and vote on IGC's applications for rezoning and for the use permit.

Shortly thereafter, the city's administrative officer made it clear to IGC that the first building permit would not be issued until land had been acquired under the $600,000 plan. IGC then obtained appraisals of the three summit parcels owned by the Calls, Albany Hill Associates, and Golden Gate Hill Development Co. Using the results of these appraisals, it extended offers to the respective owners. None was accepted.

IGC's appraiser appraised the Calls' 1.1-acre parcel at $63,800. Responding to the $63,800 offer for his property, Call wrote to IGC, describing

---

[6]Whether conveyance of the two-acre parcel was part of IGC's original offer is unclear. IGC's letter of November 3 referred to "the acreage that we will be dedicating" which—presumably—included the two-acre parcel at the summit. However, the two-acre summit parcel was not specifically designated until IGC "reiterated" its original offer.

recent sales of "comparable zoned properties" in Albany. He stated: "While we have no interest in selling at this time, we would be agreeable to having the property go into a park for the City of Albany. From the comparables listed above, our property is clearly worth $360,000 . . . . In view of the above mentioned, your offer is unacceptable. I would be willing to meet and negotiate."

IGC then authorized real estate broker Jack Krystal to negotiate with the property owners to arrange purchases in satisfaction of the $600,000 plan. Krystal's commissions were to be paid by the sellers.

After rejecting Krystal's first offer of $180,000, Call agreed to sell to IGC for $258,000.[7] At all times during the negotiations with Krystal, Call knew that IGC was acquiring the parcel for conveyance to the city pursuant to the $600,000 plan.

In June 1973, Krystal presented a written contract to the Calls, wherein IGC offered to buy their 1.1-acre parcel for $258,000. The offer was for title to the parcel "free of liens, encumbrances, easements . . . and conditions of record . . . other than exceptions of record" shown in an attached preliminary title report. IGC expressly conditioned the contract upon its "being issued all necessary permits to a project located adjacent to this property."[8]

The written escrow instructions provide a clear overview of the transactions. IAC delivered buyer's instructions with which it deposited in escrow an application for the first-phase building permit; the sum of $600,000; and an additional $68,000 to cover fees and charges payable to the city upon issuance of the building permit. IAC instructed the escrow holder to pay "any remaining balance" of the $600,000 to the city, and to pay the $68,000 to the city, upon receipt in escrow of a building permit issued by the city.

The city's escrow instructions directed the escrow holder to transmit the building permit to IAC when the holder was able to transmit to the city the required fees ($68,000), the unexpended balance of the $600,000 plan ($2,000), and the grant deeds for the summit parcels.

---

[7]Krystal also obtained Albany Hill Associates' summit parcel at a price considerably higher than the original offer. Together, the two purchases exhausted all but $2,000 of the $600,000.

[8]This condition was also included in the contract between IGC and Albany Hill Associates, the partnership whose 2.2-acre parcel IGC acquired in partial satisfaction of the $600,000 plan.

The Calls deposited two grant deeds with instructions to deliver both deeds when the escrow holder held for their account the $258,000, minus certain itemized deductions. One of the deeds was a grant deed which conveyed the 1.1-acre parcel to Cebert, the entity IGC had designated as the actual buyer of the two parcels from the Calls and Albany Hill Associates. The other was a grant deed conveying to the Albany Lions Club "an easement" on the parcel "for ingress and egress to maintain the existing cross standing" on the parcel. This large monumental cross—a steel structure 15 to 20 feet high and firmly anchored in a permanent base—had been erected by the Lions Club in 1971 with the Calls' permission. Visible from all areas of the city, it was illuminated at night during the Christmas and Easter seasons.

Shortly before the close of escrow, Call had insisted upon burdening the parcel with the easement,[9] and although it was not an "exception of record" to its title, IGC offered no objection. The president of IGC testified that although he would not have been willing to pay as much for the Calls' parcel with the easement on it (because of the obvious diminution in the parcel's value), he was fairly indifferent to the creation of the easement on what was to be a public park. Without objection, therefore, the parcel was burdened with the easement before it was conveyed to Cebert (and by Cebert to the city).[10]

At a meeting conducted on August 21, 1973, the city council adopted a resolution by which it approved a tentative map of IGC's project. Call voted for this resolution. The council also adopted a resolution accepting the grant deed from Cebert, as well as a "ratifying" resolution in which it stated that it did "approve and ratify the purchases of the certain real properties . . . described in that Grant Deed [referred to in the previous resolution]." Acting on the advice of the city attorney, Call abstained from voting on these two resolutions. There is no evidence that the members of the council, other than Call, knew that the Calls' 1.1-acre parcel was being accepted by the city subject to the easement for maintenance of the cross.

When escrow closed on August 24, 1973, the Lions Club had the cross and its easement for the maintenance of the cross. IGC had its building permit and began large-scale construction of its project shortly thereafter. The city had acquired land for Overlook Park, including the Calls' parcel,·

---

[9] Call testified that he told Krystal he would sign the sales contract "on one condition . . . that the cross will remain there permanently and an easement over the property to the cross is granted."

[10] Cebert deposited into escrow a grant deed conveying title to both parcels to the city. The deed did not show that title to the Calls' parcel was to be conveyed subject to an easement held in connection with the cross.

subject to the easement held by the Lions Club. And, of course, the Calls had their $258,000, less certain itemized deductions such as the broker's commission.

Evidence received as to the fair market value of the Calls' 1.1-acre parcel in 1973 was detailed and conflicting. IGC's appraiser fixed it at $63,800 as of February 18, 1973. Plaintiffs' appraiser testified that the value of the parcel was $100,000 in March of 1973. By contrast, an appraiser who testified for the Calls fixed its value in August 1973 at $450,000. All three appraisals are premised upon the assumption that the highest and best use of the 1.1-acre parcel was for the high-density residential construction which its R3HC zoning permitted. The $63,800 figure was based upon the estimate that the parcel would accommodate 22 units evaluated at $2,900 per unit for appraisal purposes.[11] Plaintiffs' figure of $100,000 was based on an estimate of 35 units evaluated at approximately $3,000 per unit. The Calls' figure was based on 90 units at $5,000 per unit.

Although the Calls had acquired the parcel in 1970 at a price much lower than any of the appraisers' figures, there was evidence that the pendency and size of IGC's project had substantially increased the market value of the parcel and nearby property in 1972 and 1973. On the other hand, testimony by several witnesses supported an inference that the value of the parcel had been severely diminished by the location of the cross and by the easement granted to the Lions Club. Obviously, the cross and easement would prevent or limit construction of the high-density residential units allowed by the parcel's zoning and presupposed by the appraisers' "highest and best use" calculations.

## DECISION OF THE TRIAL COURT

The trial court filed a memorandum of decision reviewing the evidence in detail and stating the following conclusions: the complex transaction had produced a "single contract" in which Call had a financial interest in violation of section 1090; the appropriate remedy consists of retention by the city of the parcel of land sold by the Calls and a "forfeiture" of the $258,000 (plus interest) by the Calls to the city; the other defendants are not liable to the city in any respect.[12] With regard to IGC, the court found

---

[11]The president of IGC disagreed with his appraiser's assumption that only 22 units could be constructed on the parcel; he estimated that it would accommodate 90 units at $3,000 per unit.

[12]During the trial, plaintiffs had dismissed the action with prejudice as to defendant Jack Krystal. At the close of plaintiff's case, Call's fellow councilmen moved for judgment under Code of Civil Procedure section 631.8. That motion was granted.

Although the court found that IGC was not liable to the city, it did note that IGC had apparently breached its agreement by conveying the Calls' parcel encumbered with the easement in favor of the Lions Club. However, it did not render judgment against IGC, observing that there was "no cause of action in Plaintiffs' complaint embracing such a breach."

that IGC had not made itself a trustee or agent in agreeing to devote $600,000 to acquisition of property to be deeded to the city and that even if it had become a "trustee," it faithfully fulfilled the "specific directives in the trust agreement."

Following its memorandum of decision, the trial court signed and filed elaborate findings of fact and conclusions of law and entered a judgment ordering that plaintiffs "take nothing by their complaint" from the corporate defendants and that they recover the $258,000 with interest from the Calls. The court found that no defendant had perpetrated a fraud, actual or constructive, on the city and that no defendant had conspired to defraud the city or to violate section 1090. Addressing the potential establishment clause problem raised by the city's acquisition of property burdened with a cross, the court found that the acquisition had a secular purpose and effect (use by the public as a park), that acceptance of the land neither advanced nor inhibited religion, and that it did not constitute excessive governmental entanglement with religion or violation of the First Amendment.

## DISCUSSION

### I

■ However complex the transaction, IGC's purchase of property from the Calls and Albany Hill Associates, and its conveyance of that property to the city, were in performance of a single multi-party agreement. The scope of this agreement and the interdependency of the many subordinate transactions are best revealed in the escrow instructions themselves.[13] IGC's letters proposing the $600,000 plan, the relevant resolutions adopted by the city council, the acceptance of the deeds and ratification of the purchases made by IGC, the use and building permits, and the real estate purchase contracts concerning the Call parcel and the Albany Hill Associates parcel further reflect the terms and conditions of the agreement.

The Calls contend that the purchase of their parcel was not a term or condition of the contract between IGC and the city, but was, rather, later negotiated in the performance of the contract by IGC. However, the prospect that performance of the contract would involve acquisition of the Calls' land and conveyance of that land to the city was contemplated by all parties. The land was one of only three parcels at the summit of Albany Hill which were expressly targeted in the contract for acquisition by IGC and conveyance to the city. Purchase of the Calls' parcel was clearly part of a previous arrangement; the fact that the real estate purchase contract between the Calls

---

[13]See page 641, *ante.*

and IGC was entered into after the city's acceptance of the $600,000 plan in no way alters the fact that the transactions between the Calls, IGC, and the city were part of a single agreement.

■ Moreover, the policy goals of section 1090 support the rule that public officers "are denied the right to make contracts in their official capacity with themselves *or to become interested in contracts thus made.*" (*Stockton P. & S. Co.* v. *Wheeler* (1924) 68 Cal.App. 592, 602 [229 P. 1020].) (Italics added.) We have recognized an exception to this rule where the conflict arose after the award of the contract, but this exception turns upon the fact that no earlier agreement—express or implied—existed between the official and the entity contracting directly with the city. (*City of Oakland* v. *California Const. Co.* (1940) 15 Cal.2d 573, 577 [104 P.2d 30] [councilman accepted employment with defendant construction company *after* council awarded contract to defendant and had no interest in the contract at the time it was awarded]; *Escondido Lumber etc. Co.* v. *Baldwin* (1906) 2 Cal.App. 606, 608 [84 P. 284] [contractor who received construction contract from school district purchased—without previous arrangement or agreement—materials from corporation in which a school district trustee was a stockholder and officer]; see, also, *People* v. *Deysher* (1934) 2 Cal.2d 141, 146 [40 P.2d 259].)

■ Section 1090 forbids city officers such as Call from being "financially interested in any contract made by them in their official capacity, or by any body or board of which they are members." The proscribed interest certainly includes any *direct* interest, such as that involved when an officer enters directly into a contract with the body of which he is a member. (*Osburn* v. *Stone* (1915) 170 Cal. 480 [150 P. 367]; *Berka* v. *Woodward* (1899) 125 Cal. 119 [57 P. 777]; *County of Shasta* v. *Moody* (1928) 90 Cal.App. 519 [265 P. 1032].) California courts have also consistently voided such contracts where the public officer was found to have an *indirect* interest therein. In *Moody* v. *Shuffleton* (1928) 203 Cal. 100 [262 P. 1095], for example, a county supervisor sold his printing business to his son and took a promissory note secured by a chattel mortgage on the business. Because the business helped to secure the value of the official's mortgage, we held that a conflict existed when printing contracts were awarded to the son. It is also clear that where the public officer is a stockholder in a corporation making such a contract, the contract will be adjudged void under the conflict of interest statutes.[14]

---

[14]See *Finch* v. *Riverside etc. R'y. Co.* (1891) 87 Cal. 597 [25 P. 765] (city trustee votes to approve street car franchise, said trustee being at the same time a subscriber to stock in the street car company); *Miller* v. *City of Martinez* (1938) 28 Cal.App.2d 364 [82 P.2d 519] (shareholder and employee of oil company was also a public officer).

■ As part of the transaction at issue, Call sold property to the city, using IGC as a conduit. Whether we regard his interest as direct or indirect, it is clearly a pecuniary interest forbidden by section 1090 and by the decisions applying conflict-of-interest rules generally. ■ ■ ■ ■ ■ Neither the absence of actual fraud nor the possibility of a "good faith" mistake on Call's part can affect the conclusion that this contract violates section 1090 and is therefore void.[15] (*Stigall* v. *City of Taft* (1962) 58 Cal.2d 565, 568-569 [25 Cal.Rptr. 441, 375 P.2d 289]; *San Diego* v. *S. D. & L. A. R. R. Co.* (1872) 44 Cal. 106, 113; *City of Imperial Beach* v. *Bailey* (1980) 103 Cal.App.3d 191, 197 [162 Cal.Rptr. 663]; *Fraser-Yamor Agency, Inc.* v. *County of Del Norte* (1977) 68 Cal.App.3d 201, 215 [137 Cal.Rptr. 118]; *Schaeffer* v. *Berinstein* (1956) 140 Cal.App.2d 278, 290 [295 P.2d 113]; *Hobbs, Wall & Co.* v. *Moran* (1930) 109 Cal.App. 316, 319 [293 P. 145].)[16]

## II

■ ■ ■ ■ Having established Call's violation of section 1090, we turn to the primary issue presented by this case: what is the appropriate remedy where a fully executed and performed contract has been found to violate section 1090?[17]

■ The trial court's solution—allowing the city to retain the land and, at the same time, recover the $258,000 plus interest from the Calls[18]—finds ample support in California case law. ■ Clearly, no recovery could be had for goods delivered or services rendered to the city or public agency pursuant to a contract violative of section 1090 or similar conflict-of-interest statutes. (*Moody* v. *Shuffleton, supra,* 203 Cal. 100; *Berka* v. *Woodward, supra,* 125 Cal. at pp. 121, 123-124; *Domingos* v. *Supervisors of Sacramento Co.* (1877) 51 Cal. 608; *Salada Beach etc. Dist.* v. *Anderson* (1942) 50 Cal.App.2d 306, 310 [123 P.2d 86]; *Miller* v. *City of Martinez, supra,* 28 Cal.App.2d at pp. 370-371; *Hobbs, Wall & Co.* v. *Moran, supra,* 109

---

[15]California courts have generally held that a contract in which a public officer is interested is *void,* not merely voidable. (*People* v. *Deysher* (1934) 2 Cal.2d 141, 146 [40 P.2d 259]; *Berka, supra,* at p. 27; *Stockton Plumbing, supra,* at p. 601.)

[16]See, also, Kennedy & Beck, *Interest of Public Officers in Contracts Prohibited by Law* (1955) 28 So.Cal.L.Rev. 335, 340; Kaufmann & Widiss, *The California Conflict of Interest Laws* (1963) 36 So.Cal.L.Rev. 186, 196.

[17]Injunctive relief will lie if the contract has not been performed. (See *Moody* v. *Shuffleton, supra,* 203 Cal. at pp. 100, 105; *Berka* v. *Woodward, supra,* 125 Cal. at pp. 121, 129; *Hobbs, Wall & Co.* v. *Moran, supra,* 109 Cal.App. at pp. 317, 321.)

[18]This solution assumes that the $258,000 paid to the Calls by IGC ultimately represented a sum expended by the city itself. This seems entirely reasonable. Regardless of the Calls' involvement, the $600,000 plan committed IGC to transferring $600,000 to the city, either in cash or in acquired property.

Cal.App. at p. 320; *County of Shasta* v. *Moody, supra,* 90 Cal.App. at pp. 523-525.) Moreover, the city or agency is entitled to recover any consideration which it has paid, without restoring the benefits received under the contract. (*Berka, supra,* at pp. 123-124; *Miller, supra,* at p. 370; *County of Shasta, supra,* at pp. 523-524.) Confronting this issue directly, the court in *County of Shasta* rejected the appellant's contention that the county was estopped from maintaining an action against him without first restoring or offering to restore to him the benefits it received from him under the contract. The court reasoned that because the contracts were void under the statute[19] and against public policy, "there is no ground for any equitable considerations, presumptions, or estoppels. . . . The contracts in the case at bar, as we have seen, *are against the express prohibition of the law and courts will not entertain any rights growing out of such a contract, or permit a recovery upon a quantum meruit or quantum valebat.*" (*County of Shasta, supra,* at pp. 523-524, citing *Berka, supra.* See, also, *Salada Beach etc. Dist.* v. *Anderson, supra,* 50 Cal.App.2d 306.[20])

The trial court's remedy is thus consistent with a long, clearly established line of cases. Admittedly, the resulting forfeiture seems harsh under the facts of this case. Call was found not to have committed fraud, actual or constructive, or to have conspired to violate section 1090. Indeed, he did seek and obtain advice from the city attorney on certain occasions, and he did follow the specific advice he received. No evidence in the record supports an inference that Call actually initiated the entire transaction, and there is conflicting evidence as to the difference between the fair market value of the parcel and the amount IGC actually paid for it pursuant to the $600,000 plan.

However, examination of the goals and policy concerns underlying section 1090 convinces us of the logic and reasonableness of the trial court's solution. In *San Diego* v. *S. D. & L. A. R. R. Co., supra,* 44 Cal. 106, we recognized the conflict-of-interest statutes' origins in the general principle that "no man can faithfully serve two masters whose interests are or may be in conflict": "The law, therefore, will not permit one who acts in a

---

[19]Section 4322 of the Political Code, since repealed. All conflict-of-interest cases cited in this opinion involve section 1090 or statutes which are analogous or similar.

[20]In *Salada Beach,* a director of a public utility district purchased bonds issued by the district. This transaction violated the applicable conflict-of-interest statute, which provided that a director shall not be interested in any contract awarded by the board of directors, and was therefore void. The former director contended that the district could not retain the benefits received from the transaction. Relying upon *County of Shasta* and upon the policy considerations underlying the statute, the court held that the district was not obligated to pay the former director the value of the bonds. (50 Cal.App.2d at p. 310.)

fiduciary capacity to deal with himself in his individual capacity. . . . For even if the honesty of the agency is unquestioned . . . yet the principal has in fact bargained for the exercise of all the skill, ability and industry of the agent, and he is entitled to demand the exertion of all this in his own favor." (44 Cal. at p. 113.) We reiterated this rationale more recently in *Stigall* v. *City of Taft, supra,* 58 Cal.2d 565: "The instant statutes [§ 1090 et seq.] are concerned with *any* interest, other than perhaps a remote or minimal interest, which would prevent the officials from exercising absolute loyalty and undivided allegiance to the best interests of the city." (58 Cal.2d at p. 569. See, also, *City of Imperial Beach* v. *Bailey* (1980) 103 Cal.App.3d 191, 196 [162 Cal.Rptr. 663]; *City Council* v. *McKinley* (1978) 80 Cal.App.3d 204, 212 [145 Cal.Rptr. 461]; *People* v. *Darby* (1952) 114 Cal.App.2d 412, 426 [250 P.2d 743]; *Miller, supra,* 28 Cal.App.2d at p. 366; *Hobbs, Wall & Co., supra,* 109 Cal.App. at p. 319.)

In *Stigall* we relied in part on the reasoning of the United States Supreme Court on a federal penal statute under which a contract was declared to be unenforceable because of a conflict of interest: " 'The statute is thus directed not only at dishonor, but also at conduct that tempts dishonor. This broad proscription embodies a recognition of the fact that an impairment of impartial judgment can occur in even the most well-meaning men when their personal economic interests are affected by the business they transact on behalf of the Government. To this extent, therefore, the statute is more concerned with what might have happened in a given situation than with what actually happened. It attempts to prevent honest government agents from succumbing to temptation by making it illegal for them to enter into relationships which are fraught with temptation.' " (*Stigall, supra,* 58 Cal.2d at p. 570, quoting *United States* v. *Mississippi Valley Generating Co.* (1961) 364 U.S. 520 [5 L.Ed.2d 268, 81 S.Ct. 294].) Implicit in this reasoning is the assumption that the purpose of such statutes is "not only to strike at actual impropriety, but also to strike at the appearance of impropriety." (*City of Imperial Beach, supra,* 103 Cal.App.3d at p. 197 [construing § 1090].)

It follows from the goals of eliminating temptation, avoiding the appearance of impropriety, and assuring the city of the officer's undivided and uncompromised allegiance that the violation of section 1090 cannot turn on the question of whether actual fraud or dishonesty was involved.[21] Nor is an actual *loss* to the city or public agency necessary for a section 1090 violation. In *Stigall,* for example, a city councilman had a financial interest in a plumbing company which submitted the *lowest* bids for a municipal contract. Taxpayers sued to have the contracts declared void. They did not

---

[21]See *Kennedy & Beck, supra,* at page 340; *Kaufmann, supra,* at page 196.

allege "actual improprieties," nor did they contend that the contract was unfair, unjust, or not beneficial to the city. (58 Cal.2d at p. 568.) On these facts, we nonetheless concluded that the contract violated section 1090, reasoning that the "object of these enactments is to remove or limit the *possibility* of any personal influence, either directly or indirectly which might bear on an official's decision, as well as to void contracts which are actually obtained through fraud or dishonest conduct." (*Id.* at p. 569. See, also, *San Diego* v. *S. D. & L. A. R. R. Co.*, *supra*, 44 Cal. at p. 13; *City of Imperial Beach*, *supra*, 103 Cal.App.3d at p. 197; *Fraser-Yamor Agency, Inc.*, *supra*, 68 Cal.App.3d at p. 215; *Schaeffer* v. *Berinstein* (1956) 140 Cal.App.2d 278, 290 [295 P.2d 113].)[22] And in *Shuffleton*, *supra*, we observed that "it matters not how fair upon the face of it the contract may be, the law will not suffer [the official] to occupy a position so equivocal and so fraught with temptation." (203 Cal. at p. 105.)

In short, if the interest of a public officer is shown, the contract cannot be sustained by showing that it is fair, just and equitable as to the public entity. Nor does the fact that the forbidden contract would be more advantageous to the public entity than others might be have any bearing upon the question of its validity. (*Capron* v. *Hitchcock* (1893) 98 Cal. 427 [33 P. 431].)

■ Moreover, California courts have consistently held that the public officer cannot escape liability for a section 1090 violation merely by abstaining from voting or participating in discussions or negotiations.[23] (*Stigall, supra*, 58 Cal.2d at pp. 570-571; *Hobbs, Wall & Co., supra*, 109 Cal.App. at p. 319.) Mere membership on the board or council establishes the presumption that the officer participated in the forbidden transaction or influenced other members of the council. (*Stigall, id.; Fraser-Yamor Agency, Inc., supra*, 68 Cal.App.3d at pp. 211, 215; *Hobbs, Wall & Co., supra*, 109 Cal.App. at p. 319. See, also, *Kennedy & Beck, supra*, at pp. 340-341; *Kaufmann, supra*, at p. 196.) Similarly, the full disclosure of an interest by an officer is also immaterial,[24] as disclosure does not guarantee an absence

---

[22]"[N]or is it necessary to show actual fraud, dishonesty, or loss to invalidate the transaction. The purpose . . . is to remove all indirect interest of an interested officer as well as to discourage deliberate dishonesty. [Citations.] It is not the character of the contract itself, but the manner in which it is created, that renders it violative of sound public policy." (*Berinstein, supra*, 140 Cal.App.2d at p. 290.)

[23]See, e.g., *City of Imperial Beach, supra*, where a councilwoman possessed an interest in a concession stand on a municipal pier. The question in the action by the city for declaratory relief was whether the city council could renew or extend a contract it had with the concession operators. Because the city council would have to approve any such renewal and the contract rates, the court held that it would be prohibited under section 1090, even if the councilwoman abstained from voting: "It is not her participation in the voting which constitutes the conflict of interest, but her potential to do so." (103 Cal.App.3d at p. 195.)

[24]See *Berka, supra*, 125 Cal. at page 129; *Stockton Plumbing & Supply Co., supra*, 68 Cal.App. at page 603.

of influence. To the contrary, it has been suggested that knowledge of a fellow officer's interest may lead other officers to favor an award which would benefit him.[25]

■ The case law supports strict enforcement of conflict-of-interest statutes. Mitigating factors—such as Call's disclosure of his interest in the transaction, and the absence of fraud—cannot shield Call from liability.[26] Moreover, the trial court's remedy—allowing the city to keep the land and imposing a money judgment against the Calls—is consistent with California law and with the primary policy concern that every public officer be guided solely by the public interest, rather than by personal interest, when dealing with contracts in an official capacity. Resulting in a substantial forfeiture, this remedy provides public officials with a strong incentive to avoid conflict-of-interest situations scrupulously.

On the other hand, the forfeiture in this case is undeniably harsh in light of the absence of fraud and Call's partial reliance upon advice given by the city attorney. Also, beyond the effect of the trial court's decision on the Calls, it has been suggested that such a harsh prohibition of financial interest may frustrate the strong public policy goal of attracting competent individuals to public service positions. This argument assumes—not unreasonably, perhaps—that some of the most qualified potential civic leaders are usually those engaged in business or in the professions, and that currently many such persons otherwise qualified and willing to serve are discouraged from serving because of the possibility of public disgrace, criminal penalties, and

---

[25]*Kaufmann, supra,* at page 196. We recognize the difficulty faced by a public officer who—for reasons beyond his control—finds himself in a potential conflict-of-interest situation. In addition to fully disclosing the interest, abstaining from relevant votes and discussions, seeking the advice of the city attorney, and refraining from taking advantage of the situation, it has been suggested that he could divest himself of the interest (prior to official action) or, in some instances, actually resign from his office. (*People* v. *Darby, supra,* 114 Cal.App.2d at p. 426.) Resignation from office does not, however, appear to be a viable alternative; indeed, it may be counter to the public interest in retaining competent public officers. In the instant case, Call was under no compulsion to negotiate with or sell the parcel to IGC. He could have simply informed IGC that to sell his land to the city, using IGC as a conduit, would place him in a conflict-of-interest situation; he would thereby have avoided any interaction with IGC which might implicate him in the $600,000 plan. If, after IGC's performance of the $600,000 plan, the city still wished to acquire the Calls' parcel, it could have done so through eminent domain.

[26]We note, also, that this case does not confront us with a purely innocent or unknowing violation of the statute. Knowing that the city would be purchasing the property, Call negotiated for the $258,000 selling price which the evidence suggested may be well above fair market value. He did vote on some of the relevant matters, and his consultations with the city attorney and abstinence from certain votes appear to satisfy niceties of form rather than the substantial ethical demands of his public office. Moreover, Call insisted upon the easement, thereby considerably diminishing the value of the land which he knew was to be purchased by the city.

harsh forfeitures such as that imposed upon the Calls.[27] Furthermore, the public has an interest in securing the best possible contractual arrangement for goods or services, even if it is an arrangement involving a public official.

We have considered the possibility of an intermediate solution which—though less severe than that imposed by the trial court—would nonetheless discourage public officials from becoming involved in potential conflict-of-interest situations. One approach would allow the city to retain the park land while allowing the Calls to retain only the fair market value of the land *at the time of its conveyance to IGC,* plus interest. The city's outlay would thus be equivalent to what it would have paid the Calls in an eminent domain proceeding. Arguably, this remedy would be consistent with the trial court's finding that there was no fraud or conspiracy to violate section 1090.

Of course, such an approach would involve difficult valuation problems. As the facts in this case suggest, appraisers' calculations often vary dramatically. Should the Calls' parcel be appraised with or without the cross and easement? Obviously, the easement would reduce the fair market value of the property considerably, perhaps rendering it unsuitable for development at the best and highest uses allowed under R3HC zoning. Should the fair market value of the parcel reflect the changes in value attributable to IGC's development? That development may, itself, be implicated in the section 1090 violation at issue in this case.

However difficult the valuation problems, courts are qualified and experienced in such matters. A more serious problem with this approach is that it really provides only a weak incentive for public officials to avoid such situations. If they enter into such arrangements and "get caught" in the section 1090 violation, this remedy would leave them as well off as they were prior to the transaction; if the violation goes unnoticed or unchallenged, they would profit from the deal. Certainly the deterrent effect of the trial court's solution is greater, effectively implementing the conflict-of-interest statutes' strict public policy goals.

This intermediate approach also assumes, in effect, that in situations such as this the targeted "wrong" is the loss to the city or the councilman's undue profit—i.e., the amount Call received in excess of a given fair market value. There is indeed substantial evidence that $258,000 was higher than the fair market value of the 1.1-acre parcel, especially in light of the easement for maintenance of the cross. However, our review of the case law

---

[27]See Note, *Conflict of Interest in Public Contracts in California* (1956) 44 Cal.L.Rev. 355; Note, *Temptation and Tradition in the California School Board* (1952) 5 Stan.L.Rev. 61.

construing and applying section 1090 and similar statutes indicates that the contract here would have violated section 1090 even if Call's return had *not* been greater than the fair market value. Section 1090 prohibits *any* financial interest, not merely an undue profit. *If the parcel had been sold at the lowest appraisal level ($63,800) or for a price actually lower than the fair market value, Call would nonetheless have violated section 1090.* The prophylactic function of the statute is to prevent conflicts of interest from occurring—not simply to recoup losses or force violators to disgorge profits.

Theoretically, a range of possibilities less harsh than the forfeiture imposed by the trial court could be devised. For example, the city could be allowed to retain the land and recover the $258,000, *minus the amount the Calls actually paid* for the land in 1970. This approach would circumvent thorny valuation problems (the Calls' purchase price is an easily ascertainable sum), provide some incentive for officials to avoid conflict-of-interest situations, and still allow the Calls to recoup most of their out-of-pocket losses. However, like the fair market value approach outlined above, this out-of-pocket-loss solution also implies that undue profit and loss to the city are the primary concerns of section 1090, and that full disclosure and the absence of a finding of fraud are key considerations in determining liability under section 1090.

The facts of this case represent but one of endless permutations generated by the basic conflict-of-interest situation, and a different remedy could be tailored for each. The trial court's approach adheres to precedent established by a long line of California cases. It is consistent with the policy of strict enforcement of conflict-of-interest statutes, it provides a strong disincentive for those officers who might be tempted to take personal advantage of their public offices, and it is a bright-line remedy which may be appropriate in many different factual situations. As we have seen, *civil liability* under section 1090 is not affected by the presence or absence of fraud, by the official's good faith or disclosure of interest, or by his nonparticipation in voting; nor should these considerations determine the civil remedy.[28] For these reasons, and because of the significant public policy goals which mandate strict enforcement of conflict-of-interest statutes such as section 1090, we conclude that the remedy applied by the trial court was justified, supported by both California case law and public policy.

---

[28]Where the official commits fraud or conspires to violate section 1090, he will, of course, also be subject to criminal sanctions under section 1097: "Every officer or person prohibited by the laws of this state from making or being interested in contracts, or from becoming a vendor or purchaser at sales . . . is punishable by a fine of not more than one thousand dollars ($1,000), or by imprisonment in the state prison, and is forever disqualified from holding any office in this state."

## III

■ Plaintiffs, on their appeal, contend that the trial court erred in failing to hold the corporate defendants liable to the city. They argue, first, that the corporate defendants acted as the city's agents in the performance of the contract embodied in the $600,000 plan, and that they breached their duties as agents in conveying encumbered land to the city. Alternatively, it is argued that the corporate defendants breached their duties as trustees to the city. These theories are answered by the trial court's conclusion that "[w]ith respect to the $600,000 plan, and the satisfaction of its obligations thereunder, IGC was neither the agent nor the trustee of the City of Albany." Substantial evidence supports the underlying finding that the $600,000 plan did not vest in the city any right or power to control the real property acquisitions of IGC in its performance of the plan. Nor did the city attempt to control any act of IGC relating to the real property at issue. The corporate defendants are therefore not liable to the city on either theory.

The judgment is affirmed.

Broussard, J., Reynoso, J., Grodin, J., and Lucas, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I concur in the judgment against Hubert F. Call, but I cannot agree that the corporate defendant is free of liability. The evidence is clearly to the contrary.

The trial court observed in its memorandum decision: "IGC does appear to have been guilty of one breach of its agreement . . . [with the City] . . . . Though IGC was motivated solely by a desire to obtain a building permit and to protect its development, . . . it recognized that the City . . . was interested in making a public park at the top of the hill. IGC therefore used that as its inducement to the City as, for example, in the letter of November 3, 1972 offering 'to make a major effort to preserve the Albany Hill top for public use,' and promising the City 'a unique, superb and useful view park for the public enjoyment.' The sales agreement with Call . . . called for title free and clear of all liens, encumbrances, easements, et cetera. Notwithstanding this, . . . IGC consented to a demand of Call . . . that title be taken subject to . . . an unrestricted easement of access by the Albany Lions Club to and for maintenance of . . . [the] . . . cross which had been erected on the Call property.

"The President . . . of IGC [Wilson] testified that Call was allowed to impose the burden of the easement because IGC didn't care what restrictions might be placed upon the property as long as they did not constitute a potential threat to the development of IGC's property. . . . Allowing the

property to be so encumbered can hardly be said to be consistent with 'a major effort to save and preserve the Albany Hill top for public use,' given the legal and practical complications thus entailed.''

The IGC contract with the city obligated it to convey fair value to the city in the form of land suitable for use as a public park. The 1.1-acre parcel it acquired from the Calls and conveyed to the city, through Cebert, represents less than fair value because of the extent to which its worth has been diminished by the cross and the easement. The easement protects the location and existence of the cross, which renders the land unsuitable for use as a park because of the constitutional proscriptions precluding the display of a religious symbol on public property. (*Fox* v. *City of Los Angeles* (1978) 22 Cal.3d 792, 797 [150 Cal.Rptr. 867, 587 P.2d 663].)

It was IGC that allowed the land to be burdened with the easement before conveying the land to the city pursuant to the contract, although it should have been obvious that the easement negated the city's purpose in acquisition. The trial court recognized that result in its memorandum decision: "With the cross and unrestricted easement on the property . . . the property was virtually undevelopable and therefore of virtually no commercial value." And, of course, the perpetual religious symbol rendered the property legally unsuitable for park or other public purposes. Nevertheless the court exonerated the corporation of liability to the city under the state of the pleadings; a separate lawsuit was suggested as a remedy for the city.

That result allows IGC to escape liability in this proceeding by an unduly narrow interpretation of the complaint. As the Court of Appeal held, deferment to future litigation rather than adjudication of liability in this action is neither in the public interest nor serves judicial economy. I would direct, as did the Court of Appeal, that on remand the plaintiffs should be permitted to amend their complaint to seek appropriate damages against IGC for breach of contract. Recovery would appear to be certain, with only the amount of damages to be determined.

Bird, C. J., concurred.

The petition of defendants and appellants for a rehearing was denied July 29, 1985, and the opinion was modified to read as printed above.