TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

DANIEL E. LUNGREN
Attorney General

---

|  |  |  |
|---|---|---|
| OPINION | : | No. 94-207 |
| of | : | |
|  | : | May 13, 1994 |
| DANIEL E. LUNGREN | : | |
| Attorney General | : | |
|  | : | |
| CLAYTON P. ROCHE | : | |
| Deputy Attorney General | : | |
|  | : | |

---

THE HONORABLE LOUISE RENNE, CITY ATTORNEY, CITY AND COUNTY OF SAN FRANCISCO, has requested an opinion on the following question:

May the San Francisco Art Commission consider and approve the architectural design for a terminal at the San Francisco International Airport as required by the city charter if (1) the contract for the design was awarded to an architectural firm chosen by the San Francisco Airports Commission and (2) the architectural firm has as a partner an architect who is also a member of the San Francisco Art Commission?

CONCLUSION

The San Francisco Art Commission may not consider and approve the architectural design for a terminal at the San Francisco International Airport as required by the city charter if (1) the contract for the design was awarded to an architectural firm chosen by the San Francisco Airports Commission and (2) the architectural firm has as a partner an architect who is also a member of the San Francisco Art Commission.

ANALYSIS

Section 1090 of the Government Code[1] provides in part:

"Members of the Legislature, state, county, district, judicial district, and city officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members."

---

[1]All references hereafter to the Government Code are by section number only.

We are asked to determine whether a violation of section 1090 would occur in a situation where the public official with the financial interest is not responsible for awarding the contract. The San Francisco Airports Commission has awarded a contract to an architectural firm to design a new terminal at the San Francisco International Airport. The firm employs 700 architects and has approximately 20 partners. Under section 3.601 of the San Francisco City Charter, the design must be approved by the San Francisco Art Commission. If the latter fails to approve the original design, a new design must be submitted at no further cost to the city until one satisfactory to the commission is tendered. One of the members of the art commission is an architect who is a partner in the firm. He is responsible for all of the firm's work in the area of urban design and planning. The issue to be resolved is whether the architect, as a member of the art commission, would violate section 1090 by having to approve the design submitted by his firm. We conclude that he must resign from the commission before it considers the design of the airport terminal.

In 76 Ops.Cal.Atty.Gen. 118 (1993), we summarized the general requirements of section 1090 as follows:

". . . Section 1090 is concerned with financial interests, other than remote or minimal interests, which would prevent officials from exercising absolute loyalty and undivided allegiance in furthering the best interests of their public agencies. (See *Stigall* v. *City of Taft* (1962) 58 Cal.2d 565, 569.) Moreover, when section 1090 is applicable to one member of the governing body of a public entity, the proscription cannot be avoided by having the interested member abstain; the entire governing body is precluded from entering into the contract. (*Thomson* v. *Call* (1985) 38 Cal.3d 633, 647-649; *Stigall* v. *City of Taft, supra,* 58 Cal.2d at p. 569; *City of Imperial Beach* v. *Bailey* (1980) 103 Cal.App.3d 191, 197; 70 Ops.Cal.Atty.Gen. 45, 48 (1987); 69 Ops.Cal.Atty.Gen. 102, 104 (1986).) A contract which violates section 1090 is void. (*Thomson* v. *Call, supra,* 38 Cal.3d at p. 646.)" (*Id.*, at p. 119; fn. omitted.)

In a recent informal opinion (Cal.Atty.Gen., Indexed Letter, No. IL 92-1212 (Jan. 26, 1993)), we concluded that a former member of a city planning commission would violate section 1090 if he were to enter into a contract with the city to be a consultant with respect to the city's general plan revision. While he was still a commission member, the planning commission had adopted a policy to use consultants instead of staff members for the plan revision. This policy was adopted in a somewhat segmented fashion through approval of budget allocations during prior fiscal years and various discussions held by members of the planning commission and its subcommittees. In determining that the consulting contract would be "made" by the former commissioner in his official capacity for purposes of section 1090, we stated:

"The critical test for determining whether section 1090 has been violated is whether an officer or employee has participated in the making of a contract in his or her official capacity. (*Millbrae Assn. for Residential Survival* v. *City of Millbrae* (1968) 262 Cal.App.2d 222, 237; 66 Ops.Cal.Atty.Gen. at 160-161.) `[T]he statute not only strikes at situations that do involve actual fraud and dishonesty but also at those in which such is absent but in which the *possibility* exists nonetheless for *personal* influence of an interested [officer] to be brought to bear, either directly or indirectly, on an official decision. [Citations.]' (66 Ops.Cal.Atty.Gen. at 160, fn. 3.)

"In *People* v. *Sobel* (1974) 40 Cal.App.3d 1046, 1052, the court outlined the broad reach of section 1090:

`The decisional law, therefore, has not interpreted section 1090 in a hypertechnical manner but holds that an official (or a public employee) may be convicted of violation no matter whether he actually participated personally in the execution of the questioned contract, if it is established that he had the opportunity to, and did, influence execution directly or indirectly to promote his personal interests.'

In *Millbrae Association for Residential Survival* v. *City of Millbrae, supra*, 262 Cal.App.2d at 237, the court defined the `making' of a contract to include the preliminary discussions, negotiations, compromises, reasoning, planning, drawing of plans and specifications, and solicitation for bids.

"Section 1090's prohibition applies regardless of whether the contract is found to be fair and equitable (*Thomson* v. *Call* (1985) 38 Cal.3d 633, 646-649) or the official abstains from all participation in the decision to contract (*Fraser-Yamor Agency, Inc.* v. *County of Del Norte* (1977) 68 Cal.App.3d 201, 211-212). In *Thomson* a city mayor was found to have violated section 1090 despite his selective abstentions on votes concerning the acquisition of his property by the city, upon advice he received from his city attorney. The court refused to segment the `transaction' as urged by the mayor to preclude a violation of section 1090.

"Section 1090 applies to persons in advisory positions to contracting agencies. (*City Council* v. *McKinley* (1978) 80 Cal.App.3d 204, 212-213; *Schaefer* v. *Berinstein* (1956) 140 Cal.App.2d 278, 291-292.)

"In *Stigall* v. *City of Taft* (1962) 58 Cal.2d 565, 569-571, the court concluded that where a councilman had been involved in the preliminary stages of the planning and negotiating process but had resigned from the council prior to its vote on the contract, he nonetheless had been involved in the `making' of the contract. In *City Council* v. *McKinley*, supra, 80 Cal.App.3d at 212, the court followed this reasoning, stating:

> `. . . The negotiations, discussions, reasoning, planning, and give and take which go beforehand in the making of a decision to commit oneself must all be deemed to be a part of the making of an agreement in the broad sense [citation] . . . . If the date of final execution were the only time at which a conflict might occur, a city councilman could do all the work negotiating and effecting a final contract which would be available only to himself and then present the matter to the council, resigning his office immediately before the contract was executed. He would reap the benefits of his work without being on the council when the final act was completed. This is not the spirit nor the intent of the law which precludes an officer from involving himself in the making of a contract.'

"In 66 Ops.Cal.Atty.Gen. 156, we concluded that county employees who proposed that their functions be accomplished through private consulting contracts were barred from contracting with the county to perform such services. We stated:

> `We are told that the persons involved, while employees of the county and *as employees of the county*, have provided input in the

formulation of the contract . . . . By that participation in the give and take that went into such "embodiments" of the contract and drawing of plans and specifications, the county employees had the opportunity to, and did bring their influence to bear on the ultimate contract itself. While no fraud or dishonesty may have been involved, we are nonetheless satisfied that in so doing they participated, *not* in their personal capacities but in their official ones as *county employees*, in the `making of the contract' within the meaning of section 1090 . . . .' (*Id.* at p. 160.)"

We have consistently determined that any modifications to a contract would also fall within the proscription of section 1090. (See 65 Ops.Cal.Atty.Gen. 305, 308-309 (1982); 3 Ops.Cal.Atty.Gen. 333, 334 (1944); Cal.Atty.Gen., Indexed Letter, No. IL 87-601 (June 8, 1987).)

With these various conclusions, principles, and interpretations in mind, we turn to the awarding of the San Francisco airport terminal contract. The art commissioner here would be financially interested in the contract as a partner in the architectural firm even if the art commission were to approve the first proposed design submitted. As a partner, he would share in any profits from the contract. Should the art commission reject the first design, under the terms of the contract the firm's profits would necessarily be reduced as each new design was submitted to the art commission for approval.

While the commissioner would clearly have a financial interest, the question remains whether the contract would be "made" by him as a member of the art commission for purposes of section 1090. If the contract for the design were examined in isolation up to the time of its award, we might conclude that the commissioner would not be in violation of the statute. The contract would only be "made" by the airports commission, the awarding body. Such an approach, however, is neither realistic nor in accord with the case law. The "making" of a contract within the meaning of section 1090 is not to be given a hypertechnical meaning; all the facts and circumstances surrounding the contract are to be examined. Essentially, if it is determined that an official participated in the transaction, *taken in its totality*, and it would or potentially could affect his personal financial interests, then the official would fall within the section 1090 proscription. (See *Thomson* v. *Call*, *supra*, 38 Cal.3d 633, 647-649.)

Here, the approval of the design services by the art commission is part of the original contract. The transaction may not be segmented into two steps. Although the contract was awarded by the airports commission, it was not merely for a design, *but for a satisfactory design*. The art commission will in essence determine the ultimate terms and conditions of the contract, that is, what constitutes a satisfactory design. As such, art commission members may be said to be participants in the making of the contract.

The function of the art commission may be likened here to determining whether the original contract should be affirmed or modified. If the original design is satisfactory, the commission in effect will affirm the original contract, thus participating in its "making." If the original design is not satisfactory, the contract will essentially be "modified" by a new design approved by the art commission, thus again making the art commissioners participants in the contract's execution. (See, e.g., 65 Op.Cal.Atty.Gen., *supra*, 308-309.)

In sum, the basic transaction here is the submission by the architectural firm of a satisfactory design for a new airport terminal. The commissioner in question will participate in the transaction through his commission's review and approval of the design. To conclude otherwise

would give section 1090 a strict, hypertechnical construction which would be contrary to the consistent and longstanding approach taken by the courts and this office.

Having concluded that section 1090 would otherwise be applicable herein, we must consider whether one of the sanctioned "remote interests" contained in section 1091 would allow the art commission to approve the contract without first requiring the resignation of one of its members. Section 1091 states:

"(a) An officer shall not be deemed to be interested in a contract entered into by a body or board of which the officer is member within the meaning of this article if the officer has only a remote interest in the contract and if the fact of that interest is disclosed to the body or the board of which the officer is a member and noted in its official records, and thereafter the body or board authorizes, approves, or ratifies the contract in good faith by a vote of its membership sufficient for the purpose without counting the vote or votes of the officer or member with the remote interest.

"(b) As used in this article, `remote interest' means any of the following:

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(11) That of an engineer, geologist, or architect employed by a consulting engineering or architectural firm. This paragraph applies only to an employee of a consulting firm who does not serve in a primary management capacity, and does not apply to an officer or director of a consulting firm.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ."

We believe that section 1091's remote interest exception for consultants is inapplicable in the present circumstances. The art commissioner with the financial interest in the airport terminal contract may be "employed" by the architectural firm; however, he is also a partner in the firm. Hence, he is not only an employee, but an owner.[2] Also, he serves in a primary management capacity as the design quality partner responsible for all of the firm's work in the area of urban design and planning. The interest of the art commissioner here thus does not meet the requirements for the remote interest exception of subdivision (b)(11) of section 1091.[3]

In answer to the question presented, therefore, we conclude that the San Francisco Art Commission may not consider and approve the architectural design for a terminal at the San Francisco Airport as required by the city charter if (1) the contract for the design was awarded to an architectural firm chosen by the San Francisco Airports Commission and (2) the architectural firm has as a partner an architect who is presently a member of the San Francisco Art Commission.

\* \* \* \* \*

---

[2]We are informed that his partnership interest is approximately five percent.

[3]Whether the architectural firm in question may be considered a "consulting" architectural firm in the circumstances presented for purposes of section 1091, subdivision (b)(11) is beyond the scope of this opinion.