BILL LOCKYER Attorney General CLAYTON P. ROCHE Deputy Attorney General
THE HONORABLE DEAN FLOREZ, MEMBER OF THE STATE ASSEMBLY, has requested our opinion on the following questions:
1. Would it be a violation of Government Code section 1090 for the sole shareholder of a corporation that operates an ambulance service under a certificate of public convenience and necessity issued by a city to hold the office of mayor of the city?
2. Would it be a violation of Government Code section 1090 for a city council to modify the terms of an ambulance service rate schedule where the ambulance service is operated by a corporation of which the mayor of the city is the sole shareholder?
3. Would it be a violation of Government Code section 1090 for a city council to modify the terms of an agreement allowing interruption of the traffic signals of the city in exchange for payment of an annual fee, where the agreement is made with a corporation of which the mayor of the city is the sole shareholder?
4. Do the offices of Mayor of the City in Bakersfield and Director of the 15th District Agricultural Association constitute incompatible public offices?
 CONCLUSIONS
1. It would not be a violation of Government Code section 1090
for the sole shareholder of a corporation that operates an ambulance service under a certificate of public convenience and necessity issued by a city to hold the office of mayor of the city.
2. It would not be a violation of Government Code section 1090
for a city council to modify the terms of an ambulance service rate schedule where the ambulance service is operated by a corporation of which the mayor of the city is the sole shareholder.
3. It would be a violation of Government Code section 1090 for a city council to modify the terms of an agreement allowing interruption of the traffic signals of the city in exchange for payment of an annual fee, where the agreement is made with a corporation of which the mayor of the city is the sole shareholder.
4. The offices of Mayor of the City of Bakersfield and Director of the 15th District Agricultural Association do not constitute incompatible public offices.
 ANALYSIS
The City of Bakersfield ("City") issues certificates of public convenience and necessity to those providing ambulance services within the City. The City does not impose a fee for issuing a certificate, but it does set the amount an ambulance operator may charge for its services. In addition, an ambulance operator may pay an annual fee of $500 to the City to be able to interrupt the City's traffic signal system in an emergency. Recently, the sole shareholder of a corporation that has a certificate to operate an ambulance service within the City, as well as an agreement allowing him to interrupt the City's traffic signals, was elected Mayor of the City. He currently serves as a Director of the 15th District Agricultural Association ("District") which operates the Kern County Fair and other events on property located outside the boundaries of the City.
With this factual background in mind, we turn to the four questions presented for resolution.
1. Election to Office of Mayor
The first issue to be addressed is whether Government Code section1090[1] prohibits a person who holds a certificate of public convenience and necessity to provide ambulance services within a city from becoming the city's mayor. We conclude that it does not.
Section 1090 states in part:
 "Members of the Legislature, state, county, district, judicial district, and city officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members. Nor shall state, county, district, judicial district, and city officers or employees be purchasers at any sale or vendors at any purchase made by them in their official capacity."
It is evident from the statutory language that section 1090 does not establish a qualification for holding public office. Rather, public officers are prohibited under its terms from entering into certain contracts where they would have a financial interest. (See Thomson v. Call (1985) 38 Cal.3d 633, 649-650; People v. Honig (1996)48 Cal.App.4th 289, 313-318; Eldridge v. Sierra View Local Hospital District (1990) 224 Cal.App.3d 311, 321; City of Imperial Beach v. Bailey (1980) 103 Cal.App.3d 191, 194-196; 82 Ops.Cal.Atty.Gen. 126, 128-129 (1999); 81 Ops.Cal.Atty.Gen. 373, 374-375 (1998); 76 Ops.Cal.Atty.Gen. 118, 119-120 (1993); 73 Ops.Cal.Atty.Gen. 191, 195 (1990).)
Section 1090 thus has no application to whether someone may be elected to public office. We conclude in answer to the first question that it would not be a violation of section 1090 for the sole shareholder of a corporation that operates an ambulance service under a certificate of public convenience and necessity issued by a city to hold the office of mayor of the city.
2. Ambulance Service Rate Schedule
The second issue to be addressed concerns a proposed modification of the terms of the ambulance service rate schedule previously adopted for the ambulance service operated by the mayor's corporation. We conclude that the rate schedule may be modified by the city council without violating the prohibition of section 1090.
Section 1090 expressly refers to the making of a "contract." In determining whether a contract is present for purposes of the statutory prohibition, we apply traditional contract principles. (See 78 Ops.Cal.Atty.Gen. 230, 234 (1995).) Here, the fee schedule is not a contract or part of a contract as that term is normally understood. Instead, the schedule sets one of the terms of a contract between the ambulance operator and the person to whom the ambulance service is provided. The City receives nothing for setting the rate schedule; no fee is imposed other than to cover its costs of processing the rate schedule application.
The corporation's certificate of public convenience and necessity constitutes a license; it is a regulatory permit. (Subriar v. City of Bakersfield (1976) 59 Cal.App.3d 175; see Motor Transit Co. v. Railroad Commission (1922) 189 Cal. 573, 580; Copt-Air v. City of San Diego (1971)15 Cal.App.3d 984, 987.) The rate schedule is adopted as part of the certificate of public convenience, and any modification of the rate schedule is a modification of the certificate itself. A modification of the rate schedule would thus be a regulatory matter and not a "contract" in the ordinary sense of the word. Accordingly, the prohibition of section 1090 would be inapplicable to any change in the rate schedule.
Even though section 1090 would not preclude modification of the rate schedule by the City, we note that the mayor, as a public official, would be subject to the limitations of the Political Reform Act of 1974 (§§ 81000-91014), including its conflict of interest provisions. Under sections 87100-87103.6, the mayor would be prohibited from participating in the proceedings of the city council which involve the fee schedule modification. (See also Clark v. City of Hermosa Beach (1996) 48 Cal.App.4th 1152, 1170-1172 [common law prohibition against conflict of interests may require abstention where personal or financial interest involved].)
We conclude in answer to the second question that it would not be a violation of section 1090 for a city council to modify the terms of an ambulance service rate schedule where the ambulance service is operated by a corporation of which the mayor of the city is the sole shareholder.
3. Traffic Signal Interruption Agreement
The third question focuses on the agreement between the mayor's corporation and the City that allows the corporation to interrupt the City's traffic signal system in exchange for payment of an annual fee. May the terms of this agreement be modified without violating the prohibition of section 1090? We conclude that the prohibition would be applicable.
As with the provisions of the ambulance service rate schedule, we first examine the terms of the traffic signal interruption agreement in light of traditional contract principles. Is the agreement a "contract" for purposes of section 1090? Unlike the rate schedule, the traffic signal agreement involves the payment of an annual fee to the City in exchange for control over the City's property in a manner inconsistent with use by the general public. Both parties obtain a benefit in executing the agreement. Under traditional contract principles, the agreement constitutes a contract between the City and the mayor's corporation. (See 78 Ops.Cal.Atty.Gen., supra, at p. 234.)
Since the mayor is a member of the legislative body that would be responsible for making any modifications to the traffic signal agreement, section 1090 would prohibit modification of the agreement while the mayor holds office. (See City of Imperial Beach, supra, 103 Cal.App.3d at pp. 194-197; 81 Ops.Cal.Atty.Gen. 134, 135-137 (1998); 68 Ops.Cal.Atty.Gen. 337, 352 (1985).)[2]
We conclude in answer to the third question that it would be a violation of section 1090 for a city council to modify the terms of an agreement allowing interruption of the traffic signals of the city in exchange for payment of an annual fee, where the agreement is made with a corporation of which the mayor of the city is the sole shareholder.
4. Incompatibility of Public Offices
The last question concerns whether the mayor, by taking his oath of office, has forfeited his office as a director of the District. We conclude that the two offices may be held simultaneously by the same person.
The common law doctrine of incompatible public offices, applicable in California,[3] prohibits a person from holding simultaneously two public offices if the performance of the duties of either could have an adverse effect on the other. (People ex rel. Chapman v. Rapsey (1940)16 Cal.2d 636, 641-642; 78 Ops.Cal.Atty.Gen. 362, 363 (1995).) If the offices are incompatible, the acceptance of the second office automatically terminates the holding of the first. (People ex rel. Chapman v. Rapsey, supra, 16 Cal.2d at p. 644; 83 Ops.Cal.Atty.Gen. 50, 52 (2000).)
Offices are incompatible if either office exercises a supervisory, auditory, or removal power over the other, or if there would be a significant clash of duties and loyalties in the holding of both offices simultaneously. (People ex rel. Deputy Sheriffs' Assn. v. County of Santa Clara (1996) 49 Cal.App.4th 1471, 1481; 82 Ops.Cal.Atty.Gen. 74, 75 (1999); 81 Ops.Cal.Atty.Gen. 304, 304-305 (1998).)
We have previously determined that a mayor holds an "office" for purposes of the incompatible offices doctrine. (73 Ops.Cal.Atty.Gen. 357 (1990); 63 Ops.Cal.Atty.Gen. 623 (1980).) The District (Food Agr. Code, § 3865) is a state agency (Food Agr. Code, § 3953), whose directors are state officers (Food 
Agr. Code, § 3962), and thus we have previously concluded that a director of a district agricultural association holds an "office" for purposes of the incompatible offices doctrine (33 Ops.Cal.Atty.Gen. 49, 50 (1959)).
Here, neither office in question exercises a supervisory, auditory, or removal power over the other. Would there be a significant clash of duties and loyalties in holding both offices at the same time? The District conducts the county fair and other events on property that is not located within the City. The District's facilities receive no City services such as police or fire protection, water, electricity, or trash collection. There are no contracts of any kind between the two public bodies. However, we are informed that on March 23, 1998, the City rented a District building for one day, and the District has allowed the City use of its parking lot from time to time without charge for police training.
In 33 Ops.Cal.Atty.Gen. 49, supra, we concluded that the offices of city council member and district agricultural association director may be incompatible, depending upon the particular circumstances involved. If the district's property is located outside the city's boundaries and there are only occasion dealings between the two bodies, the offices would not be incompatible for purposes of the prohibition. (Id., at pp. 52-53.) However, where the district holds events on the city's property, the offices would be incompatible, since "[u]nder such circumstances, the dealings between the city council and the association are among the principal and important duties of a director of the First District Agricultural Association, and are bound to recur annually rather than being infrequent and matter of chance occurrences." (Id., at p. 53.)
Similarly, in 71 Ops.Cal.Atty.Gen. 39 (1988), we looked at the core functions of the offices in question and concluded that a person could serve simultaneously as a member of the State Industrial Welfare Commission and member of the Los Angeles County Superintendent of Schools Personnel Commission. In Letter Opinion No. 96-406 (June 4, 1996), we concluded that a person could serve simultaneously on the board of trustees of a community college district and on the board of directors of a hospital district, relying upon a prior opinion (Ops.Cal.Atty.Gen., Indexed Letter, No. IL 75-222 (Oct. 8, 1975), which had concluded that offices were compatible if the possibility of a conflict was a matter of conjecture that might arise on a transactional basis rather than being part of the regular duties of the two offices.
Here, the contacts between the City and the District have involved only infrequent dealings not involving the core functions of the two offices. We do not believe that this virtually nonexistent relationship between the City and the District gives rise to an incompatible conflict of duties sufficient to provide a "significant clash of . . . loyalties" (37 Ops.Cal.Atty.Gen. 21, 22 (1961) "`in the regular operation of the statutory plan'" (66 Ops.Cal.Atty.Gen. 176, 177 (1983) so as to disqualify a person from simultaneously holding both offices.
We conclude in answer to the fourth question that the offices of mayor of the City and director of the District do not constitute incompatible public offices.
[1] All references hereafter to the Government Code are by section number only.
[2] The Legislature has created various exceptions to the prohibition of section 1090, including what are deemed "remote interests" (§ 1091; see 67 Ops.Cal.Atty.Gen. 369, 377, fn. 8 (1984); 65 Ops.Cal.Atty.Gen. 305, 307 (1982)) and "noninterests" (§ 1091.5; see 81 Ops.Cal.Atty.Gen. 327, 328-329 (1998); 81 Ops.Cal.Atty.Gen. 169, 172-173 (1998)). In addition, a "rule of necessity" has been applied in particular circumstances to permit the execution of a contract that would otherwise be prohibited. (See 69 Ops.Cal.Atty.Gen. 102, 107-112 (1986).) The possible application of any of these exceptions is beyond the scope of this opinion.
[3] "The common law of England, so far as it is not repugnant to or inconsistent with the Constitution of the United States, or the Constitution or laws of this State, is the rule of decision in all courts of this State." (Civ. Code, § 22.2)