[No. D045374. Fourth Dist., Div. One. June 15, 2005.]

DAVID R. CHAPMAN et al., Petitioners, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
DAVID MALCOLM, Real Party in Interest.

## Counsel

Duane E. Bennett; Richards, Watson & Gershon, Darold D. Pieper, Gregory M. Kunert; Coughlan, Semmer & Lipman, R. J. Coughlan, Jr., Cathleen G. Fitch and Earll M. Pott for Petitioners.

Jennifer B. Henning for California State Association of Counties as Amicus Curiae on behalf of Petitioners.

Manuela Albuquerque for the League of California Cities as Amicus Curiae on behalf of Petitioner the San Diego Port District.

No appearance for Respondent.

Stanford & Associates, Dan L. Stanford, Jora J. Zulauf; Law Office of Charles Sevilla and Charles M. Sevilla for Real Party in Interest.

OPINION

**McCONNELL, P. J.**—Government Code[1] section 1090 prohibits an office-holder from having a financial interest in any contract made by the public agency of which he or she is a member. Section 1090 is intended to protect the public agency's interests and those of its constituency by assuring undivided loyalty and allegiance, removing direct and indirect influence of an interested officer and discouraging dishonesty. (*Thorpe v. Long Beach Community College Dist.* (2000) 83 Cal.App.4th 655, 659–660 [99 Cal.Rptr.2d 897] (*Thorpe*).)

In an underlying criminal matter, David Malcolm, a former member of the Board of Commissioners (Board) of the San Diego Unified Port District (Port District), pleaded guilty to violating section 1090 while on the Board. We hold here that as a matter of public policy, Malcolm may not maintain this legal malpractice action against the Port District under a respondeat superior theory, and its former counsel, David R. Chapman, based on Chapman's advice to Malcolm that allegedly caused Malcolm's damages arising from the criminal matter. As there is no triable issue of material fact requiring trial, the Port District and Chapman are entitled to summary judgment. Accordingly, we grant the petition.

## FACTUAL AND PROCEDURAL BACKGROUND

In January 1995 Malcolm was appointed to the Board.

In November 1998 the Port District, San Diego Gas and Electric (SDG&E) and Duke Energy Power Services (Duke) entered into a memorandum of understanding (MOU) under which the Port District would purchase SDG&E's South Bay Power Plant, located in Chula Vista on property under the Port District's jurisdiction, for $110 million. Further, under the MOU Duke would lease and operate the plant for 10 years at a rent of at least $115 million and pay the costs of decommissioning the plant at the end of the lease term. In December 1998 the Board authorized the Port District's acquisition of the South Bay Power Plant by approving several agreements with SDG&E and Duke.

Chapman was the Port District's in-house legal counsel at the relevant time. After execution of the MOU, Malcolm told Chapman he "thought . . . the South Bay Power Plant deal could be replicated around the country," and he planned to enter into a personal business relationship with Duke. Malcolm also told Chapman he wanted to retain Jeffrey Heintz, an attorney who

---

[1] Statutory references are to the Government Code except when otherwise specified.

assisted the Port District in acquiring the South Bay Power Plant. Chapman advised Malcolm he had no problem with Malcolm's use of Heintz, and when Malcolm made a deal with Duke he must abstain from voting on any Port District issue involving Duke and disclose any income from Duke on his conflict of interest forms. Chapman did not tell Malcolm about section 1090, that he was not providing Malcolm with legal advice, that Malcolm should consult another attorney, or that Chapman needed any further information or to see any contract Malcolm entered into with Duke.

In January 1999, after speaking with Chapman, Malcolm formed a company called Public Benefit Power (PBP) with the purpose of entering into transactions with Duke and communities that wanted to decommission aging power plants. Malcolm, who was one of PBP's three owners, sought to acquire the land on which power plants were situated and make a profit by selling or developing the land after the plants were decommissioned.

In April 1999 Malcolm told Chapman he and Duke had entered into a written contract to attempt to acquire a power plant. Thereafter, Malcolm recused himself from any Port District votes concerning Duke.

In May 2000, however, the arrangement changed from one of looking for business opportunities with Duke to one of consulting. Duke and PBP entered into a written contract requiring Duke to pay PBP $20,000 per month for Malcolm's services concerning modernization plans *for the South Bay Power Plant* and "similar generating facilities" throughout the country, and a one-time bonus of 1 1/2 percent on any funding Malcolm secured on Duke's behalf for the construction of a modernized plant *in the South Bay*.

The contract noted Malcolm "has substantial experience and knowledge with respect to political and local issues relevant to [Duke's] electric generating facility known as the South Bay plant, . . . and to similar generating facilities throughout the United States." Additionally, the contract contained a conflict of interest clause that prohibited Malcolm from advising, counseling or otherwise assisting any competitor or potential competitor of Duke, including the Port District.

Malcolm informed Chapman about the new arrangement with Duke and that he would be earning "a six-figure number." Chapman again told Malcolm he was required to divulge payments from Duke and abstain from voting on any Port District matter involving Duke.

Beginning in July 2000, Malcolm advised Duke it could benefit from the expansion of an existing "Enterprise Zone" to include the South Bay Power

Plant.[2] Malcolm wrote to Duke that "[w]ith soaring utility costs in San Diego, the environment to construct new facilities has NEVER been better. Everyone is saying the only way to lower the utility bills is to build new facilities. With the present outrage over utility bills, it seems Duke would be well served to bring additional focus to the South Bay Plant." Malcolm also solicited political support for this endeavor from officials in San Diego and Chula Vista.

In a November 30, 2000 memorandum from the Port District's executive director, Dennis Bouey, to the Board, he advised that "the City of Chula Vista and BF Goodrich have asked the Port [District] to financially support their efforts to expand the San Ysidro/Otay Mesa . . . Enterprise Zone . . . including 402.1 acres of Port [District] tidelands. This [Enterprise Zone] expires in January 2007, unless the legislature amends the current law. The issue is whether the Port [District] should contribute $292,425 over the next 6.5 years when development of the former BF Goodrich and Pond 20 [Port District tenants] properties may not occur soon enough to take full advantage of [the Enterprise Zone's] tax benefits." Bouey noted the South Bay Power Plant would be in the expanded Enterprise Zone, and businesses within it "are eligible for substantial tax credits and benefits that directly affect a business' tax liability." The City of Chula Vista sought the $292,425 to share in the cost of hiring one additional full-time employee to manage the expanded area of the Enterprise Zone.

A proposed MOU with the City of Chula Vista regarding the Port District's provision of funds for the expansion of the Enterprise Zone was on the agenda for the Board's December 12, 2000 meeting. The Board approved an MOU, and the minutes note Malcolm was excused from the vote.

On December 18, 2001, Chapman wrote a memorandum to the Board regarding the contract between Duke and PBP, which had been revealed to

---

[2] The Government Code contains the Enterprise Zone Act (§ 7070 et seq.), which is intended to promote through incentives the development, stability and expansion of private business, industry and commerce in areas that are economically depressed because of lack of investment by the private sector. (§ 7071, subds. (a), (b).) "Enterprise zone" is defined as "any area within a city, county, or city and county that is designated as such by the [Department of Housing and Community Development] in accordance with Section 7073." (§ 7072, subd. (d).) "Each local governmental entity of each city, county, or city and county that has jurisdiction of an enterprise zone shall approve, by resolution or ordinance, the boundaries of its targeted employment area." (§ 7072, subd. (h).) Incentives include, but are not limited to, the "suspension or relaxation of locally originated or modified building codes, zoning laws, general development plans, or rent controls"; the "elimination or reduction of fees for applications, permits, and local government services"; the "establishment of a streamlined permit process"; the "elimination or reduction of construction taxes or business license taxes," and the "provision or expansion of infrastructure." (§ 7073, subd. (b)(2)(A)–(C), (3) & (4)(A).)

some Commissioners in conjunction with a third party lawsuit against Malcolm. The memorandum was marked privileged and confidential as an attorney-client communication. Chapman wrote: "I have previously advised you . . . that I was aware of no facts which suggested that Commissioner Malcolm's business arrangement with Duke violated any law, specifically including any conflict of interest law governing the conduct of Port [District] Commissioners. Having now seen the Consulting Agreement, that remains my view. The law does not prohibit conflicts of interest . . . . Rather, the law requires that certain interests be disclosed and that a public official not participate in matters where he or she may have a conflict of interest. [¶] Without question, the Consulting Agreement gives rise to a conflict of interest for Commissioner Malcolm in matters involving the Port District and Duke. To the best of my knowledge, in recognition of that conflict of interest, Commissioner Malcolm has met his legal obligation to abstain from any Port District matters involving or affecting Duke."

The San Diego Union-Tribune obtained a copy of Chapman's memorandum, and in a December 28, 2001 article it revealed the contract between Duke and PBP. The article stated that "[a]t the height of the energy crisis, Port Commissioner David Malcolm was being paid $20,000 a month by Duke . . . under a contract that required him to put the power company's interests ahead of all others, including those of the Port District," and "[c]ritics say Malcolm breached the public trust and should resign from the Port Commission." The following month, Malcolm resigned from the Board.

In the spring of 2003 Malcolm learned the San Diego County District Attorney (District Attorney) was contemplating multiple charges against him, including attempted perjury, two section 1090 violations and misappropriation of funds, and that a grand jury investigation was underway. Malcolm negotiated a deal with the District Attorney in which he would plead guilty to one count of violating section 1090, a felony, in exchange for its agreement to not pursue other charges.

On April 30, 2003, the District Attorney charged Malcolm with violating section 1090 by "becoming financially interested in the contract between the . . . Port District and City of Chula Vista to expand the enterprise zone." The same date, Malcolm pleaded guilty to the charge and the parties stipulated the plea would resolve all pending District Attorney investigations. Malcolm's plea states: "On May 22, 2000, I became a party to a consulting contract with Duke . . . . Thereafter, on December 12, 2000, an item expanding the Enterprise Zone, that could benefit Duke, came before the Commission. Although I did not vote on the project, under Government Code [section] 1090 I had a financial interest and therefore abstention was not enough and I should have resigned my position as a Port Commissioner." The court

sentenced Malcolm to three years of probation and 120 days of work furlough, imposed a $1,000 fine under section 1090 and a $10,000 fine under Penal Code section 1202.4, subdivision (b) and ordered him to pay the District Attorney $249,000 in restitution.

In September 2003 Malcolm sued Chapman and the Port District for legal malpractice.[3] The complaint alleges Chapman wrongfully failed to advise Malcolm of section 1090 and that his arrangement with Duke required him to resign from the Board rather than merely disclose income from Duke and abstain from voting on Port District matters involving Duke. Malcolm seeks to recover damages resulting from his criminal prosecution, such as lost business opportunities, attorney fees and emotional distress damages.

The Port District and Chapman moved for summary judgment, arguing Chapman had no attorney-client relationship with Malcolm as a matter of law, and in any event, maintenance of the cause of action violates public policy, as section 1090 is intended to protect public agencies from officeholders' self-dealing. In a tentative ruling the court denied the motion, explaining "the cases addressing the issue of whether an attorney-client relationship is created between a public entity officer and the public entity attorney, when advice is sought and given, are confusing and difficult to reconcile." The court found underlying triable issues of fact regarding whether Chapman and Malcolm had an attorney-client relationship. The court rejected the public policy argument, finding the "public should be able to trust that its public attorney would provide proper legal advice so as to avoid the scandal as well as the expense of a criminal prosecution. These are issues of fact and may be more appropriate as argument at trial. Defendants have not cited any authority that holds that this public policy bars plaintiff's claim as a matter of law." After oral argument, the court affirmed its tentative ruling.

## DISCUSSION

### I

### *Standard of Review*

■ A "party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he [or she] is

---

[3] Under sections 825, subdivision (a), and 995, a public agency is required to defend and indemnify an employee against claims for injuries arising out of an act or omission occurring within the scope of his or her employment. The complaint also included a breach of fiduciary duty cause of action against Chapman, but the court granted his special motion to strike it under Code of Civil Procedure section 425.16, known as the anti-SLAPP (strategic lawsuit against public participation) statute. That cause of action is not at issue in this proceeding.

entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493].) A defendant satisfies this burden by showing " 'one or more elements of' the 'cause of action' in question 'cannot be established,' or that 'there is a complete defense' " to that cause of action. (*Ibid.*) If the defendant meets his or her initial burden, "the opposing party is then subjected to a burden of production of his [or her] own to make a prima facie showing of the existence of a triable issue of material fact." (*Ibid.*)

■ "De novo review is used to determine whether, as a matter of law, summary judgment was appropriately granted." (*Camarillo v. Vaage* (2003) 105 Cal.App.4th 552, 560 [130 Cal.Rptr.2d 26].) We strictly construe the moving party's affidavits and liberally construe the opposing party's affidavits. (*Fraizer v. Velkura* (2001) 91 Cal.App.4th 942, 945 [110 Cal.Rptr.2d 918].) " ' "We accept as undisputed facts only those portions of the moving party's evidence that are not contradicted by the opposing party's evidence. . . . In other words, the facts alleged in the evidence of the party opposing summary judgment and the reasonable inferences therefrom must be accepted as true." [Citation.]' " (*Ibid.*)

## II

### *Demurrer*

■ Malcolm demurs to the petition on the ground it does not sufficiently set forth the undisputed facts supporting summary judgment in favor of the Port District and Chapman. (Code Civ. Proc., § 1089; Cal. Rules of Court, rule 56(h)(1).) A proceeding in mandamus is generally subject to the general rules of pleading applicable to civil actions. (*Gong v. City of Fremont* (1967) 250 Cal.App.2d 568, 573 [58 Cal.Rptr. 664], citing Code Civ. Proc., § 1109.) "Therefore, it is necessary for the petition to allege specific facts showing entitlement to relief . . . . If such facts are not alleged, the petition is subject to general demurrer [citation] or the court is justified in denying the petition out of hand." (*Gong v. City of Fremont, supra,* at p. 573.)

■ The Port District and Chapman concede "the absence of a traditional statement of facts" in the petition. They contend the petition's incorporation of the parties' separate statements of undisputed facts and hundreds of pages of accompanying exhibits satisfied their obligation. That is, of course, incorrect. "The reviewing court is not required to make an independent, unassisted study of the record in search of error or grounds to support the judgment. It is entitled to the assistance of counsel." (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 594, p. 627.)

We nonetheless overrule the demurrer. In their first reply to Malcolm's response to the petition, the Port District and Chapman set forth the specific facts of the case, and despite an inadequate rendition of undisputed facts in the petition Malcolm was able to file two briefs fully addressing the issues.

## III

### *Attorney-client Relationship*

The Port District and Chapman contend that as a matter of law a public agency's counsel and an agency board member cannot have an attorney-client relationship. They rely on *Ward v. Superior Court* (1977) 70 Cal.App.3d 23 [138 Cal.Rptr. 532], in which the court held there was no attorney-client relationship between counsel for the County of Los Angeles and the county assessor, and thus counsel was not disqualified from representing a county board member and county employees in litigation against them by the assessor. The court found the undisputed evidence showed that any legal advice counsel gave the assessor arose from his obligation to advise county officers in matters pertaining to their duties, and counsel's only client was the county. (*Id.* at pp. 28, 32; see also *Civil Service Com. v. Superior Court* (1984) 163 Cal.App.3d 70, 78 [209 Cal.Rptr. 159] [this court noted "the general proposition that a public attorney's advising of a constituent public agency does not give rise to an attorney-client relationship separate and distinct from the attorney's relationship to the overall governmental entity of which the agency is a part"].)

Malcolm counters that there are underlying factual issues regarding the existence of an attorney-client relationship. " 'The determination of the existence of an attorney-client relationship . . . is one of law. "However where there is a conflict in the evidence the factual basis for the determination must first be determined, and it is for the trial court to evaluate the evidence. [Citation.]" [Citations.]' " (*Ward v. Superior Court, supra,* 70 Cal.App.3d at p. 31.)

Malcolm relies on Chapman's deposition testimony that the Port District expected him to "be available to individual commissioners to give them assistance in addressing, among other things, conflict of interest issues." Further, Malcolm presented evidence that Chapman encouraged commissioners to come to him with any conflict of interest questions. In a July 9, 1996 memorandum, Chapman provided commissioners with copies of the "Political Reform Act for insertion in the Conflict of Interest binders I provided to you some time ago." Chapman stated that "[w]hile the Act may be a helpful resource, I encourage you to contact . . . me . . . with any specific questions you may have." Chapman also wrote, "[s]ituations involving conflicts of

interest will arise from time to time, and each commission member should feel free to consult this memorandum and should also contact the Port Attorney's office for a thorough analysis of any given situation." In a December 2, 1998 memorandum, Chapman briefly discussed section 1090 and asked commissioners to contact him with any specific questions on that statute.

In a declaration, Malcolm stated he approached Chapman numerous times with various conflict of interest issues, and Chapman regularly provided advice to him. When Malcolm asked Chapman about the Duke situation, Chapman told him that once a relationship was formed he must disclose all compensation received from the deal and recuse himself from any vote involving Duke. Chapman never told Malcolm he was not providing legal advice, or that Malcolm should not rely on his advice or consult another attorney. Moreover, there is evidence Chapman knew Malcolm was following his advice on the Duke matter. During meetings of the Board, Malcolm would occasionally ask Chapman whether he should recuse himself from voting on a Duke matter, and Chapman would agree that he should.

We seriously question whether the attorney-client issue here is susceptible of resolution as a legal matter. The cases the Port District and Chapman rely on are not factually on point, and a "decision is authority only for the point actually passed on by the court and directly involved in the case. General expressions in opinions that go beyond the facts of the case will not necessarily control the outcome in a subsequent suit involving different facts." (*Gomes v. County of Mendocino* (1995) 37 Cal.App.4th 977, 985 [44 Cal.Rptr.2d 93]; see *Chevron U.S.A., Inc. v. Workers' Comp. Appeals Bd.* (1999) 19 Cal.4th 1182, 1195 [81 Cal.Rptr.2d 521, 969 P.2d 613].) Moreover, an attorney's conflict in representing the interests of two parties and his or her actual creation of an attorney-client relationship with both parties are ordinarily different issues.

We are not, however, required to resolve the attorney-client issue, and we express no opinion on the matter. Rather, we conclude that notwithstanding any such relationship between Chapman and Malcolm, for public policy reasons Malcolm cannot maintain this action because it is grounded on his illegal conduct.

## IV

### *Governing Statute*

■ "Section 1090 is a general prohibition against an officeholder's financial interest in a contract.[4] Section 1090 prohibits any public officers or employees from having any financial interest, direct or indirect, in any contract made by them in their official capacity or by any board or commission of which they are a member." (*Thorpe, supra,* 83 Cal.App.4th at p. 659.) The term "contract" is interpreted broadly under section 1090 and includes " 'the negotiations, discussions, reasoning, planning, and give and take [that] go beforehand in the making of a decision.' " (*City of Imperial Beach v. Bailey* (1980) 103 Cal.App.3d 191, 196 [162 Cal.Rptr. 663].)

■ "Where section 1090 applies, it is an absolute bar to a board or commission entering into the prohibited contract." (*Thorpe, supra,* 83 Cal.App.4th at p. 659.) Section 1090 is intended " 'to insure absolute loyalty and undivided allegiance to the best interest of the [governmental agency] they serve and to remove all direct and indirect influence of an interested officer as well as to discourage deliberate dishonesty. [Citations.]' [Citation.] ' "The statute is thus directed not only at dishonor, but also at conduct that tempts dishonor. . . ." ' Section 1090 is intended to avoid even ' "the appearance of impropriety." ' " (*Thorpe, supra,* at pp. 659–660.)

■ "California courts have consistently held that the public officer cannot escape liability for a section 1090 violation merely by abstaining from voting or participating in discussions or negotiations." (*Thomson v. Call* (1985) 38 Cal.3d 633, 649 [214 Cal.Rptr. 139, 699 P.2d 316].) "Mere membership on the board or council establishes the presumption that the officer participated in the forbidden transaction or influenced other members of the council." (*Ibid.*) Further, reliance on legal counsel's advice is not a defense to a section 1090 violation. (*Id.* at p. 646; *People v. Honig* (1996) 48 Cal.App.4th 289, 347–348 [55 Cal.Rptr.2d 555].)

■ An officeholder who "willfully" violates section 1090 "is punishable by a fine of not more than . . . $1,000 . . . , or by imprisonment in the state

---

[4] "Section 1090 provides . . . : 'Members of the Legislature, state, county, district, judicial district, and city officers or employees shall not be financially interested in any contract made by them in their official capacity, or by any body or board of which they are members. . . . [¶] As used in this article, "district" means any agency of the state formed pursuant to general law or special act, for the local performance of governmental or proprietary functions within limited boundaries.' " (*Thorpe, supra,* 83 Cal.App.4th at p. 659, fn. 2.) Section 1090 "codified the common law prohibition of public officials having a financial interest in contracts they make in their official capacities." (*BreakZone Billiards v. City of Torrance* (2000) 81 Cal.App.4th 1205, 1230 [97 Cal.Rptr.2d 467].)

prison, and is forever disqualified from holding any office in this state." (§ 1097.) The term "willfully" means "the official must purposefully make a contract in which he is financially interested." (*People v. Honig, supra,* 48 Cal.App.4th at pp. 334, 336–338.) The requirement of willfulness "restricts the reach of this felony statute [§ 1090] to circumstances one might plausibly call wrongful intent or malum in se." (*Id.* at p. 338.)

V

*Public Policy*

For public policy reasons, courts may preclude particular types of actions. (See, e.g., *Holland v. Thacher* (1988) 199 Cal.App.3d 924, 930 [245 Cal.Rptr. 247] [attorney sued for malpractice may not bring cross-action for indemnity against client's successor attorney]; *PPG Industries, Inc. v. Transamerica Ins. Co.* (1999) 20 Cal.4th 310, 316 [84 Cal.Rptr.2d 455, 975 P.2d 652] [insured may not obtain indemnity from insurer for punitive damages]; *Musser v. Provencher* (2002) 28 Cal.4th 274, 285 [121 Cal.Rptr.2d 373, 48 P.3d 408] [legal malpractice claims are not assignable]; *Wiley v. County of San Diego* (1998) 19 Cal.4th 532, 536–537 [79 Cal.Rptr.2d 672, 966 P.2d 983] [actual innocence is a predicate of malpractice action against criminal defense counsel].)

The parties have not cited to us any California case in which the facts are analogous to those here, and we have found none in our independent research. The Port District and Chapman rely on *Saks v. Sawtelle, Goode, Davidson & Troilo* (Tex.App. 1994) 880 S.W.2d 466, 469 (*Saks*), in which former clients (Saks and Spruill) of the defendant law firm (Sawtelle) sued it and individual attorneys for malpractice "arising out of legal services rendered in connection with a loan transaction—a transaction which subsequently led to [Saks's and Spruill's] conviction on charges of bank fraud." (*Id.* at p. 467.) Saks and Spruill, through their partnership, borrowed approximately $19 million from three affiliated banks, ostensibly to fund a development project, but then diverted $5 million back to one of the banks to conceal a shortfall in the bank's assets that federal bank regulators were investigating. The Sawtelle firm assisted Saks and Spruill with the loan transaction and preparation of the loan documents. (*Id.* at pp. 467–468.)

A jury convicted Saks and Spruill of violating federal law by participating in a scheme with bank directors to disguise the true nature of the diverted funds. (*Saks, supra,* 880 S.W.2d at pp. 467–468.) An element of the crime was knowingly devising and executing or attempting to execute a scheme of artifice to defraud a federally chartered or insured financial institution. (*Id.* at p. 468.)

Saks and Spruill consequently sued Sawtelle for malpractice, seeking damages for lost income and profits, mental suffering, damage to reputation, loss of net worth and attorney fees, all of which stemmed from their conviction. They alleged Sawtelle negligently prepared the loan documents and "*failed to inform* [*them*] *of potential criminal violations* arising from the transaction and *misrepresented the legality of the loan transaction*" to them. (*Saks, supra,* 880 S.W.2d at p. 468, italics added.) They also alleged Sawtelle's negligent advice directly caused their criminal conduct and conviction. (*Id.* at p. 469.)

 The court held that as a matter of law, Saks and Spruill were precluded from maintaining the malpractice action because "public policy bars recovery for injuries arising from a knowing and willful crime." (*Saks, supra,* 880 S.W.2d at p. 470.) The court concluded that "[e]ven if Sawtelle is guilty of negligence or misrepresentation, this fact is not relevant in light of the public policy which bars [Saks and Spruill] from recovering compensation for the damages they incurred as a result of their conviction." (*Ibid.*) The court explained: " 'It may be assumed, as undisputed doctrine, that no action will lie to recover a claim for damages, if to establish it the plaintiff requires aid from an illegal transaction, or is under the necessity of showing or in any manner depending upon an illegal act to which he [or she] is a party.' " (*Id.* at p. 469.) Additionally, " '[p]unishment for crime is intended to be personal and absolute; and, to accomplish the prevention of crime which is the purpose of the punishment, it is quite necessary that the person should not "even entertain the hope of indemnity" for the offense committed . . . . To allow damages . . . suffered in consequence of [a] conviction would in tendency make it profitable to violate the law, and oppose the principle of denying any redress for a violation of the law.' " (*Id.* at p. 470.)

 We find *Saks* analogous and persuasive. Malcolm pleaded guilty to willfully violating section 1090. (§ 1097.) " '[W]illfully,' as applied in this context, means that the official must purposefully make a contract in which he [or she] is financially interested." (*People v. Honig, supra,* 48 Cal.App.4th at p. 334.) Willfulness denotes an element of knowledge, meaning "the official must know . . . there is a reasonable likelihood that the contract may result in a personal financial benefit to him [or her]." (*Id.* at p. 338.) Malcolm's plea establishes that when the Port District voted to expand the Enterprise Zone, he knew it would likely benefit him financially. In line with *Saks,* allegations that Chapman's negligent advice caused Malcolm to commit a crime and plead guilty are immaterial, as Malcolm cannot obtain indemnity for his willful criminal wrongdoing. Section 1090 serves as a disincentive for officers who may be tempted to take personal advantage of public office (*Thomson v. Call, supra,* 38 Cal.3d at p. 652), and the recoupment of losses attributable to a violation of the statute would undermine that salutary purpose.

██ In this case, public policy is even more compelling than in *Saks* because Malcolm seeks recovery from a public entity that *section 1090 is designed to protect.* "The prophylactic function of the statute is to prevent conflicts of interest from occurring." (*Thomson v. Call, supra,* 38 Cal.3d at p. 652.) In our view, allowing Malcolm to recoup from the public fisc losses he incurred as a result of his self-dealing, regardless of any negligent advice from Chapman, " ' " 'would indeed shock the public conscience, engender disrespect for courts and generally discredit the administration of justice.' " ' " (*Wiley v. County of San Diego, supra,* 19 Cal.4th at p. 537.) "Although the public interest is served by discouraging attorney misconduct," a "court should not encourage others to commit illegal acts upon their lawyer's advice by allowing the perpetrators to believe that a suit against the attorney will allow them to obtain relief from any damage they might suffer if caught." (*Evans v. Cameron* (1985) 121 Wis.2d 421 [360 N.W.2d 25, 29].)

Malcolm asserts Chapman gave him "expert advice on a complex legal issue," and thus he "cannot fairly be charged with knowledge that he was committing an unlawful or even a morally wrong act." He cites *Pantely v. Garris, Garris & Garris* (1989) 180 Mich.App. 768 [447 N.W.2d 864], in which the court held that a client who admitted perjuring herself in a divorce action could not maintain a legal malpractice action against the attorney who told her to testify falsely. The court found the parties were in pari delicto. (*Id.* at pp. 868–869.) The court explained, "[w]e can readily envision legal matters so complex and ethical dilemmas so profound that a client could follow an attorney's advice, do wrong and still maintain suit on the basis of not being equally at fault. But perjury is not complex; and telling the truth poses no dilemma." (*Id.* at p. 868.)

██ Malcolm simultaneously represented the Port District and Duke, and to promote his own financial interests he expressly contracted to hold Duke's interests paramount to the Port District's interests. Yet, Malcolm remained on the Board instead of relinquishing his seat. Perhaps the wrongfulness of Malcolm's conduct was not as apparent as lying under oath, but we believe the average person would readily regard it as improper notwithstanding Chapman's inexplicable disclose-and-recuse advice. Section 1090 is based on " '[t]he truism that a person *cannot serve two masters simultaneously*' [citation], which is regarded as *a 'self-evident truth, as trite and impregnable as the law of gravitation . . . .'* " (*People v. Honig, supra,* 48 Cal.App.4th at pp. 313–314, italics added.) "In our society, people of ordinary sensibility should recognize, without the intervention of a criminal proscription, that a public official is a trustee and that it is wrong for such a trustee to engage in self-dealing, including the contingent feathering of one's own nest." (*Id.* at p. 338.)

## DISPOSITION

The petition is granted. Let a writ of mandate issue directing the superior court to vacate its October 5, 2004 order and issue a new order granting the Port District and Chapman summary judgment. The Port District and Chapman are entitled to costs in this proceeding.

Nares, J., and O'Rourke, J., concurred.

The petition of real party in interest for review by the Supreme Court was denied August 31, 2005.